I concur with the majority's conclusion that plaintiff retired before his alleged diagnosis and thereby does not qualify for § 97-61.5(b) benefits. Austin v. Continental General Tire, 141 N.C. App. 397,540 S.E.2d 824 (J. Greene, dissenting), dissenting opinion adopted,354 N.C. 344, 553 S.E.2d 680); see Abernathy v. Sandoz Chemicals,151 N.C. App. 252, 565 S.E.2d 218 (2002) (retired employees not entitled to § 97-61.5(b) benefits); Moore v. Standard Mineral Co.,122 N.C. App. 375, 469 S.E.2d 594 (1996) (§ 97-61.5(b) applies to victims of occupational disease who are thereafter removed from the industry at the directive of the Commission).
I disagree with the majority's findings and legal conclusions that plaintiff has asbestosis and that he is disabled as a consequence of this disease.
Dr. Garland is the physician who examined plaintiff in lieu of the advisory medical committee. Dr. Garland reported on October 16, 2000, that plaintiff has severe emphysema, a history of asbestos exposure, however, no x-ray or spirometric evidence of asbestos-related lung disease. Although Dr. Garland notes that Dr. Bernstein diagnosed asbestosis based on radiology studies and exposure history, Dr. Garland did not agree with this finding. In contrast to other studies, Dr. Garland reported that a chest x-ray was performed as part of plaintiff's examination and that neither Dr. Garland nor the reviewing radiologist found evidence of asbestosis. Further, spirometry revealed obstructive disease consistent with COPD and emphysema. Dr. Garland was not able to associate a restrictive component to plaintiff's pulmonary impairment. Restrictive disease would be consistent with asbestosis. Thus, Dr. Garland's personal examination and the studies that he requested do not support plaintiff's claim for asbestosis.
At deposition, Dr. Garland was presented with numerous radiology reports that plaintiff's counsel represented supported a diagnosis of asbestosis. Dr. Garland did not know any of the radiologists who interpreted plaintiff's studies, and could not verify their subjective findings, except for Dr. Weaver from East Carolina University. Dr. Weaver's report indicates that plaintiff has a 1/0 B-read with the comment: "not quite up to the 1/1 standard, but clearly more abnormal, more like it than the normal standard of 0/0." A 1/0 B-read, however, does not support a medical diagnosis of asbestosis. See The Diagnosis ofNonmalignant Diseases Related to Asbestos, American Thoracic Society
(1986). The American Thoracic Society in explaining the diagnosis of asbestosis has stated:
 "It is likely that an individual who develops asbestosis moves more or less uniformly from the normal roentgenologic appearances (-/0, 0/0, 0/1) to the abnormal (1/2, 2/1, 2/2, etc.). The problem is that the interpretation of the lesser degrees of abnormality on this scale is subjective and that numerous causes of such roentgenologic shadowing other than asbestosis exist.
 In the absence of pathologic examination of the lung tissue, the diagnosis of asbestosis is a judgment call based on a careful consideration of all relevant clinical findings. In our opinion, it is necessary that there be:
A reliable history of exposure.
An appropriate time interval between exposure and detection
 Furthermore, we regard the following clinical criteria to be of recognized value:
 Chest roentgenographic evidence of type "s," "t," "u," small irregular opacifications of a profusion of 1/1 or greater
 A restrictive pattern of lung impairment with a forced vital capacity below the lower limit of normal
A diffusing capacity below the lower limit of normal
 Bilateral late or pan inspiratory crackles at the posterior lung bases not cleared by cough.
 Of these, the findings on the chest roentgenogram are the most important. When this criteria is not met, considerable caution is warranted.
Id. Note that under this standard a 0/1 profusion is a normal reading and is insufficient to support the diagnosis of asbestosis. Under ILO standards the certified B-reader is required to read the x-ray twice. The first number represents the first interpretation and the second number represents the interpretation on the second reading. Thus, a 0/1 and 1/0 readings differ only in the order of the interpretation. Therefore, a 1/0 and 0/1 reading are consistent with each other. Based on this standard, the competent evidence does not establish that plaintiff has a medically accepted diagnosis of asbestosis.
Applying the American Thoracic Society standard to this case, plaintiff has not established that he has a compensable claim for asbestosis. A comparison of Dr. Hayes' B-reads with that of other healthcare professions in this case demonstrates the American Thoracic Society's finding that profusion readings are often subjective, and thereby cannot form the sole basis for the diagnosis. This is particularly true in this case because plaintiff's severe emphysema would produce interstitial markings that could be confused with asbestosis. The Commission, at the direction of the Legislature, employs advisory medical consultations in these cases in an effort to obtain a fair, and hopefully unbiased, assessment of the medical issues. In this case, the examining physician, Dr. Garland did not find asbestosis on his examination of plaintiff and the results of plaintiff's x-ray and pulmonary tests. The only competing B-reader that Dr. Garland knew well enough to testify as to his competency is Dr. Weaver. Although Dr. Garland changed his opinion at the deposition to conclude that plaintiff has asbestosis, his changed opinion was based on the representation by plaintiff's counsel that other qualified doctors had found that plaintiff had asbestosis and that Dr. Weaver found asbestosis in his B-read. The evidence, however, is that Dr. Weaver found a profusion of 1/0 with the explanation "not quite up to the 1/1 standard but clearly more abnormal, more like it than the normal standard of 0/0." As quoted above, however, a 0/1 reading is a "normal" reading and not an abnormal reading, which is defined as a 1/2, or greater reading. And, further a 1/0 reading is essentially the same as a 0/1 reading, only referencing the order of opinions. Further, the American Thoracic Society specifically requires a roentgenographic finding of 1/1 or greater. Thus, Dr. Garland's reliance on plaintiff's counsel's representation of Dr. Weaver's B-read is in error as Dr. Weaver's finding does not meet the required standard to diagnose asbestosis.
Further, other radiographic interpretations fail to support a competent diagnosis of asbestosis. Dr. Bernstein found that plaintiff's April 2000 radiology study had a profusion level of 1/0 and Dr. Dula similarly found that plaintiff's December 2000 radiology study had a 1/0 profusion level. Dr. Hayes interpreted plaintiff's July 1998, August 1998, February 2000, July 2000, as negative for pneumoconiosis, negative for pneumoconiosis, negative, and 0/1 respectively. Although it is not unusual under the subjective ILO standards to find that different certified B-readers may arrive at different profusion readings, each of these readings falls within the accepted range of deviation and, moreover, are consistent in reporting a profusion level below the 1/1 standard adopted by the American Thoracic Society.
The evidence fails to satisfy the four-prong test (quoted above) established by the American Thoracic Society for diagnosing asbestosis in individuals with sufficient history of exposure and latency to reasonably suspect the condition. First, as explained above, the competent medical evidence is that plaintiff's profusion level on the B-reads does not rise to the required 1/1 level to support the diagnosis. Second, as explained by the hopefully neutral examining physician, plaintiff's pulmonary function testing did not support a finding of a restrictive pattern of lung impairment. Third, plaintiff's diffusing capacity was out of proportion with his breath measurement and was consistent with plaintiff's non-related obstructive disease. Further, Dr. Garland did not note any finding of crackles. Thus, applying the ATS standard to the competent medical evidence, plaintiff has not met his burden.
I further disagree that plaintiff has established disability from a compensable condition, let alone that plaintiff is permanently and totally disabled. Under the Russell test, plaintiff may establish disability in one of four ways:
 ()the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment;
 ()the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment;
 ()the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or
 ()the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.
See Russell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993). Significant to this case is the requirement that the disability must result from a compensable injury. See Lanning v.Fieldcrest Cannon, 352 N.C. 98, 530 S.E.2d 54 (2000).
The evidence is that plaintiff has severe emphysema, an obstructive lung disease, which is disabling. Plaintiff suffers from shortness of breath that is a consequence of his emphysema and was placed on oxygen for this condition. The competent evidence is that plaintiff's emphysema and COPD is the result of cigarette smoking. Even if the appellate courts should find that the majority is correct in concluding that plaintiff has asbestosis, the majority's legal conclusion that plaintiff is totally disabled from this condition is error. Plaintiff has the burden to prove that the total incapacity for work results from the injury (disease). N.C. GEN. STAT. §§ 97-29, 97-64; see Lanning v. Fieldcrest Cannon, supra; Burwell v. Winn-Dixie, 114 N.C. App. 69, 441 S.E.2d 145 (1994). Dr. Garland, as well as others, has testified a person with asbestosis is not necessarily impaired. Therefore, a finding of asbestosis does not equate to disability or impairment. The evidence is that plaintiff has unrelated obstructive disease (emphysema) that severely limits his ability to work, however, there is no showing that he has restrictive disease (such as asbestosis) that contributes to his inability to work. Plaintiff is disabled as a result of his non-compensable obstructive disease (emphysema) irrespective of whether he has asbestosis. Plaintiff has not established that he has a restrictive impairment or other condition associated with asbestosis that precludes his ability to work. Plaintiff is not entitled to § 97-29 benefits for alleged asbestosis.
I further disagree with the majority's award of $20,000 per lung pursuant to § 97-31. As stated above, plaintiff's injury to lungs is due to non-compensable emphysema and not for alleged asbestosis. Plaintiff has no restrictive impairment or other lung impairment that is related to alleged asbestosis. Therefore, recovery under this provision is not justified.
I further disagree with the majority's award of § 97-31 benefits in addition to § 97-29 benefits. Plaintiff is entitled to receive the more munificent recovery available for his injury; however, is not entitled to a double recovery. Thus, plaintiff is not entitled to recover under both § 97-29 and § 97-31. See Gupton v. BuildersTransport, 320 N.C. 38, 357 S.E.2d 674 (1987); Strickland v. BurlingtonIndus., 87 N.C. App. 507, 361 S.E.2d 394 (1987). The majority errs in awarding both benefits, particularly since the § 97-29 award and the § 97-31 award are for injury to the same part of the body, the lungs.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
DCS/gas